Please the court. My name is Paul Turner with the Federal Public Defender's Office in Las Vegas. I'm here this morning representing Encarnacion Aguilar. I'd like to reserve two minutes, Your Honor, please. This is a speedy trial case on the certified issue. Our position, of course, is that Mr. Aguilar has met the four standards of the Barker case and also as affected by the Doggett case. We also have submitted that this case under one scenario has a lot of similarity to the Klopfer case from 1968 out of Durham, North Carolina. The State had no real interest in pursuing this case with any speed at all. As the Court is probably aware, following Mr. Aguilar's arrest on September 25, 1997, the primary hearing was held on October 13, 1997. At that point, the State's witness, Detective Zimmerman, wasn't there. I believe it was represented he was out of the country, which, again, seems somewhat odd because he was the gentleman who only a few days earlier had arrested the man. But be that as it may, I'm sort of not going to malign the statements made, be that as it may, they requested a continuance. It was objected to by the defense. The continuance actually went almost three full months was the continuance. So the State, if the State had any great interest in trying this case, they certainly wouldn't have asked for three months' extra time. A week later in the record, there's some indication that, in fact, I know that there was another case against Mr. Aguilar that was proceeding. And there's some suggestion by the prosecutor, Mr. Martin Hart, that they had some interest in that case and that this one was sort of put on the sideline for a while. I would submit to the Court that, at least in the early stages here, it's clear the State's enthusiasm for pursuing the case was low. Whether or not they intentionally delayed the case, the enthusiasm never changed. Ultimately, they did try him. He was convicted. Why was the State motivated to do it later in a way different from what their motivation was the first time around? That's a good question, Your Honor, and I'm not sure, based on the record we have here, I can answer it. I do know that the other case did proceed forward. Whether there was some dynamic between the two, that's a possibility. I think there was a different prosecutor involved, although I'm not sure about that, actually. But why they wanted to pursue it later, I can't tell you. They delayed later also, though, because they had two failures, again, for the correct witnesses to appear at the preliminary hearing. When Mr. Aguilar had returned to the United States and was initially brought forward for a preliminary hearing, Detective Zimmerman, amazingly, wasn't there again. And then two weeks later, I believe, Detective Zimmerman shows up, but the other detective, the gentleman with the facility with the Spanish language, which is my client's language, he wasn't there. So there's sort of three strikes and you're out, I think, on this case, and that's our position. We admit fully that there were some delays here because of our client. He was trying to negotiate his case, which I think was a reasonable thing for him to be doing, but there is a significant delay from the State. Another significant delay is between the failure of their second effort at a preliminary hearing. At that point, Detective Zimmerman could not identify my client and the complaint was dismissed. It took them almost two full months to then indict the client. Again, there doesn't seem to be a lot of enthusiasm for pursuing the case. Now, when later the speedy trial issue is raised, the level of enthusiasm may change because of that, Your Honor. How long afterward did he raise the speedy trial issue? I'm sorry. How long was it after he was brought to charge that he raised the speedy trial issue? It was after the second. After he came back, Your Honor, it was about 14 months, I believe, roughly. That's not exactly speedy. For raising the issue, isn't that one of the factors that we have to consider? It's one of the factors, Your Honor, but it's, as I'm sure the Court's well aware, in Dargat, the Supreme Court said that none of the factors are necessary or sufficient. So you have to balance all of that. You have to balance. But I'm somewhat concerned about Factor III and Factor IV. What's the actual prejudice that's shown? I understand you got number one. It was a long time. But when you jump down to IV to show the actual prejudice, I've had trouble sensing where that is. Maybe you could help me out with that. First of all, Your Honor, I think the one aspect of prejudice, obviously, is having what appears to be a criminal charge over your head for an indefinite period of time. In our judgment, at least, somewhat similar to Mr. Clopper's situation, where this gentleman is taken out of the country down to Mexico, basically, released into Mexico. But he may or may not understand, as a non-English speaker. He was so anxious that he came voluntarily back to this country. That doesn't suggest a high level of anxiety that he's really worried about. If I go back to Nevada, they're going to threaten me with this trial. Gee, I think it's a good idea to try to cross the border. Your Honor, you're absolutely right. And that's certainly a factor here. There's actually another side to that, though. The other side that I would argue, as his advocate today, would be that he's been released by authorities of the United States back into Mexico. And he knew he had a criminal charge when they released him. Not just one. We know that his sentence is concurrent to another, I guess, similar sentence. So he's got a couple of big things waiting for him back in Nevada. And he decides to come back to the country. It's true. One possibility here, if not maybe more than a possibility, is that he thought, by letting him go, that that was over. That they had, for whatever reason, the presumption. The United States is so generous, I'd want to race back, too. We cite a presumption, as the Court knows, we cite a presumption in 8 CFR 213.3G, which is a presumption that the Federal authorities have checked with the local prosecutor and have gotten their permission before they do this. I realize that I've attempted to proffer some information into the case, and I know that that's a very delicate subject. I've also said that if the Court has doubts about the facts, that I would ask that the case be remanded so that all of the facts can be developed, because I think there are missing facts. Isn't that prohibited by ADEPA? I'm sorry, Your Honor, I didn't. Isn't ADEPA prohibited another hearing? You mean the remand? Prohibited, yeah. He couldn't qualify for an evidentiary hearing under APTA. Yeah, well, I think he did qualify for an evidentiary hearing. No, it prohibits it. Isn't it prohibited? That's what I'm suggesting to you. I don't know why it would be prohibited, Your Honor. Because they don't like the thing dragged on. No, that's true, Your Honor. But it's interestingly made. It's specified very particularly under what conditions you can get an evidentiary hearing, and I don't think you've produced any of them. Your Honor, Bruce, my response to that is the district judge wrote a 33-page opinion in this case. He didn't point out. That's not one of the exceptions written into ADEPA. But it would suggest to you, Your Honor, that there's a lot going on here. That is not one of the exceptions in ADEPA. I think diligence, a diligent effort to develop the facts. No, that's not the way the statute's written. Well, we don't have any newly ---- I don't think you're familiar with the statute. I know the underlying factors are newly new law, which we don't have. No. And we don't have ---- We don't have actual innocence or something like that. I don't know that we've certainly never made a claim that we have actual innocence. But we have a client who was diligent in trying to develop his case, and he asked for a lawyer, and he didn't get it. That's not in the statute. No. But I still say, Your Honor, that there's an exception for equitable treatment of people. No, there isn't. The Federal statute is very specific. I think we cited a case, Your Honor, I don't remember the name of it, to indicate that this Court has an equitable authority to go back and get additional facts when it feels that something is wrong. When there's an explicit statute saying you can't? I doubt that. Your Honor, I respectfully don't believe ---- You don't even have the case to tell us about. No. I cited it to the case, Your Honor, but I don't remember it off the top of my head. But there's a Ninth Circuit case dealing with equitable profits, because sometimes the facts need to be added to the case. Do you want to submit it to us? I'd be happy to, Your Honor. We've already had it, but I just don't remember it this morning. Do you want to reserve the balance of your time for rebuttal? I'd like to, Your Honor. Thank you. Good morning, Your Honor. Michael Bongard, appearing on behalf of Respondent Dwight Nevin. May it please the Court to first address what Mr. Turner was addressing with the Court. Your Honor, I believe you're absolutely correct that E-2 prohibits an evidentiary hearing when the facts that are sought to be developed were known at the time and they could have been developed in state court. All the facts that Mr. Turner sought to proffer, I think a fair reading can suggest nothing but the fact that those facts could have been developed. They were known, had the job been done in state court, either while the case was proceeding through the trial phase or on appeal or even by Mr. Aguilar during post-conviction proceedings. So I think the opportunity at this point, I think an evidentiary hearing is barred by the statute. With regards to the Barker factors, the big difference between this case and the Doggett case, and I think the district court made it clear, was the fact that in Doggett, the defendant left the country not knowing that charges were hanging over his head because the case hadn't even been charged yet. In this case, it's clear that he knew charges were pending against him because the court continued the proceedings. At the time, he was released on his own recognizance. And the district court made a point in finding that that factor weighed, while the second factor he found neutral because of the fact that there was no evidence showing that the state knew that Mr. Aguilar had been deported. There was no, again, there was nothing showing that he hadn't been deported. So the court found that that factor at the very least was neutral. The third factor, the assertion of the speedy trial right, the court found weighed heavily against Mr. Aguilar. He must. Yes, sir. And again, if you even followed the district court's ruling, he could have asserted that right back in 1997 at the time that the proceedings were initiated. He could have asserted that right at any point while he had been deported. Granted, that would be a stretch, but certainly it could be considered certainly more than 14 months. The 14 months after he came back, the six months prior, or excuse me, four months prior while the proceedings were pending, and then that four to five year period while he was gone. And again, those were the two areas where the court found this case split off from Doggett. I'm not sure I agree with you. Didn't the district court find against the petitioner in the fourth factor of actual prejudice? And I believe, and again, he found that there was no prejudice that was shown. And I think that was what the government heavily argued in Doggett, that Mr. Doggett hadn't shown prejudice either. But certainly, you know, fully analyzing the prejudice case, if there were more prejudice in either Doggett or Aguilar, it certainly would have been in this case, Your Honor. Well, Judge Jones made an exhaustive opinion. He stuck to differentiating the second and third factors in this case. And I would agree with the court that there wasn't much analysis done on the fourth factor. But certainly the third factor did weigh heavily against Mr. Aguilar in this case, where it didn't weigh against Mr. Doggett. And regarding the argument about the Cluffer case, this case differentiates again in that, in that in Cluffer there was the procedural tool that was used, there was no active prosecution. It was something that was hanging over the person's head. There was no statute of limitations tied to it. In this case, there was an active prosecution that was going on. There was no Nolley-Prosecki filed by the state. The case was continued so that the proceedings were in essence continued. Again, the delay at the initial part was four months until the state was sure that they could get that witness back. If there are no other questions, then I'd ask the court to submit. Thank you. Thank you. Rebuttal. My argument for the inherent equitable power of the court is actually on page 15 of my reply brief. And I mistakenly indicated there's a Ninth Circuit case. If there is, I haven't found that. But I found a U.S. Supreme Court case, Thompson v. Bell. I'm sorry, Sixth Circuit case, Thompson v. Bell, and a Tenth Circuit case, United States v. Kennedy, speak of inherent equitable power in the court under some circumstances to supplement the record on appeal. And that's what I was talking about. Was it in the face of this particular statute? I don't think there's anything on the face of the statute, Your Honor. You have to look behind, I think, the statute to see that. Well, I mean, your case is, do they deal with this specific statute? I believe they do, Your Honor. Yes. Well, I say that, and I don't believe – I'm not – I don't want to say that and be wrong. They speak of inherent equitable power to develop – to, you know, allow development of a record on appeal. I'm not so sure they do speak to that statute. They wouldn't. That wouldn't help you very much unless it was on this particular statute, would it? No. Well, you know we have all this inherent power, almost like the Chancellor's  Right. Every now and then the Congress ties that foot to the ground. That's very true, Your Honor. But the Constitution is always an override, at least on statute – over statute, at least. But, Mr. – Well, if the Constitution is one thing, the equitable powers of the court are another. That's true, Your Honor, although they – if they're recognized by – under Article 3 of the Constitution, they kind of carry it all the way through. But you're right. There could be distinction. I would note, though, again, and I don't want to belabor this, is that this gentleman kept asking for a lawyer and kept getting nothing. And his state petition was summarily dismissed. He got no hearing, no lawyer. He can't speak English. He's trying to argue his case. I also would point out that he went through a change of lawyers. He had a couple of private lawyers who couldn't negotiate it, apparently, and folded, gave up, or else he ran out of money. One of the two happened. He didn't have a real fair chance to get moving on his case until he got the public defender. She then did raise the untimeliness of all this very clearly. But we certainly aren't running from the fact that he should have raised it earlier. But he did raise it once he got his public defender. And he raised it strongly. And fairness here, we would submit, would allow this man two things, either a reversal here on the basis of the speeding trial or a vacation of the order and an allowance of further development of facts here. Something smells about this. Something is wrong about this, the way this man was treated. Either the State of Nevada intentionally set this up or they're terribly sloppy, very, very negligent in allowing this to happen. And I would submit that the subtleties of Federal-State relations aren't that complicated that something isn't wrong here and that something is wrong. And we'd ask the Court, hopefully, to rule for this man. Thank you. Thank you. We thank both counsel for the argument. The case just argued is submitted.
judges: Wallace, Noonan, Clifton